# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MIRIAM TORRES, fka MIRIAM SEVY,<br><br>        Plaintiff,<br><br>        v.<br><br>SUGAR-SALEM SCHOOL DISTRICT # 322, a political subdivision of the State of Idaho, and BRYCE OWEN, individually and in his capacity as a former employee of Sugar-Salem School District,<br><br>        Defendants. | Case No. 4:17-cv-00178-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. OVERVIEW

This matter comes before the Court on two separate motions for summary judgment. First, is Defendant Bryce Owen's Motion for Summary Judgment. Dkt. 46. Second, is Defendant Sugar-Salem School District #322's ("the District") Motion for Summary Judgment. Dkt. 47. The District has also filed a Motion to Strike the Declaration of Plaintiff Miriam Torres . Dkt. 57.

Torres claims that from the time she was sixteen years old Owen groomed her to have sex with him once she reached the age of majority. Dkt. 22, at 8-9. She also alleges that the District had notice of Owen's behavior and failed to report or take any action in response. Dkt. 22, at 5. Torres alleges violations of Title IX and 42 U.S.C. § 1983, as well as various counts of negligence against the defendants. Dkt. 22, at 9-16. The Court heard

oral argument on April 12, 2019. For the reasons set forth below, the Court now GRANTS in PART and DENIES in PART the District's Motion for Summary Judgment, DENIES Owen's Motion for Summary Judgment, and DENIES the District's Motion to Strike.

## II. FACTS[1]

Torres was a student at Sugar-Salem High School ("the high school") from August 25, 2010, until her graduation on June 4, 2014. Owen was hired as a Counselor at the District in 2011 and spent a few days each week working at Sugar-Salem High School.

Torres first met Owen in the beginning of her Sophomore year. It was 2011, and Torres was fifteen years old. Around September of 2011, Owen approached Torres and asked if she wanted to participate in counseling with him. Dkt. 22, at 3. At the time, Torres engaged in self-harming behavior and suspects that a friend made Owen aware of that. Dkt. 47-4, at 49. Owen's invitation made Torres uncomfortable, but she did not believe she could refuse the invitation due to Owen's position of authority at the school. Dkt. 22, at 3.

During their first counseling session (which occurred in the Fall of 2011) Owen positioned his chair in such a way that he and Torres' knees "almost touched." Dkt. 53-14, at 2; Dkt. 22, at 3. At this initial meeting, Torres told Owen that when she was fourteen, she had a sexual relationship with a thirty-two-year-old man named Jared Reid. Dkt. 53-1, at 6. Owen had her describe these sexual encounters in graphic detail—including what Reid did to her and how it made her feel. *Id.* However, Owen never indicated to Torres that such encounters were sexual abuse. Nor did he report Reid's actions to the school or the

---

[1] The Court recites the facts in the light most favorable to Torres, the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

authorities. Dkt. 53-6, at 27.

Torres estimates that Owen continued to pull her out of class for "counseling sessions" about twice weekly. Owen continued to elicit specific details of Torres' past sexual interactions during these sessions. Owen also gave Torres his personal cell phone number and told her to contact him anytime—even though the District had a policy regarding employee-student relations that stated employees were to "[r]efrain from electronically communicating with any student by any means including but not limited to texting." Dkt. 53-6, at 47, 102.

Nonetheless, Owen began texting Torres regularly. Torres' mother, Bernadine McCandless ("McCandless"), eventually discovered some of these messages and found them to be "flirty." Dkt. 53-7, at 3. McCandless reported Owen's inappropriate texts to the District's Superintendent Alan Dunn, Principal Jared Jenks, and Fred Wooley (another counselor at the high school), and insisted that Owen have no further contact with her children. *Id.* Although the District said the texting would stop, Torres claims that the texting and other contact continued. Dkt. 53, at 14. The next semester, McCandless again told the District that Owen should have no involvement or interaction with her kids. *Id.* at 5-6. This second request was made after McCandless learned Owen was still in contact with her daughter. *Id.* Despite these requests, Owen continued to contact and interact with Torres.

As Torres progressed through high school, Owen pulled her out of class more frequently. During their conversations, he revealed to Torres that he had previously engaged in sexual intercourse with clients. He also attempted to sow discord between Torres and her mother by telling Torres that McCandless was crazy and could not be

trusted. Instead, Owen told Torres that she should only confide in him. He told her "what we talk about here stays in here." Dkt. 53-14, at 3. Throughout this period, Owen continued to elicit graphic details regarding Torres' past sexual encounters with Reid, as well as details of her sexual encounters with boys closer to her own age.

As Torres approached the age of eighteen, Owen increased the frequency of his contact with her. He told Torres he loved her and was planning on leaving his wife for her. He complained about the lack of sex in his marriage and bragged about his sexual prowess during his previous affairs. He also expressed his desire to have sex with Torres but explained that they had to wait until she was eighteen. Dkt. 53-14, at 3.

Shortly after Torres turned eighteen, Owen approached her while she was working alone in the high school's sound booth. He closed the door, pulled her pants down, and had sexual intercourse with her. After this initial encounter, Owen regularly pulled Torres out of class to have sex—often in his office. Dkt. 22, at 6. Owen also asked Torres to "sext" him on multiple occasions. Dkt. 53-14, at 4.

Owen documented some of these meetings as "counseling sessions" on Torres' school attendance records. Due to the frequency of the meetings, Torres missed numerous classes, which had a negative impact on her school performance. Torres claims multiple teachers and other District employees were aware of how frequently Owen pulled her out of class. Dkt. 53-1, at 9-10.

Torres began to feel increasingly depressed, withdrawn, suicidal, and experienced panic attacks due to her relationship with Owen. She expressed her suicidal feelings to Owen, and he simply responded that he sometimes felt that way too. Dkt. 22, at 7. During

her senior year, Owen told Torres a number of times: "If I wasn't with you, I would just kill myself." Dkt. 47-4, at 49.

Following Torres' graduation from high school, she moved to Utah for the summer. Owen met her there once and they had sex a final time. This occurred sometime between June and August of 2014. Shortly afterwards, the relationship ended. Dkt. 22, at 8.

Torres began dating someone else, and ultimately married her husband in January 2015. She gave birth to her daughter in November of 2015. After giving birth, Torres began to again experience renewed feelings of depression and anxiety. That same month, Torres told her mother about Owen's relationship with her. McCandless explained that what Owen had done was abuse. Torres contends that this was the first time she had any inclination that Owen had been manipulating and abusing her. Up until that point, she believed it had been a real relationship and that Owen loved her. Dkt. 22, at 8.

McCandless immediately reported Owen's conduct to Superintendent Dunn. Torres also reported Owen to the police. In January 2016, Torres began meeting with another counselor who helped her understand that Owen had groomed her from the time she was sixteen years old to have sex with him once she turned eighteen. Dkt. 22, at 8-9.

Torres filed a notice of tort claim with the District on April 11, 2016. She filed her Complaint on April 26, 2017 (Dkt. 1), and subsequently filed her Amended Complaint on March 20, 2018 (Dkt. 22). Torres' Amended Complaint includes nine counts. Count One (Violation of Title IX), Count Two (Sex Discrimination in violation of 42 U.S.C. § 1983), and Count Nine (Negligent Supervision) are brought only against the District. The remaining claims are brought against both the District and Owen. These claims include:

Count Three (Negligence per se), Count Four (Tort of Child Abuse), Count Five (Negligence), Count Six (Negligent Infliction of Emotional Distress), Count Seven (Intentional Infliction of Emotional Distress), and Count Eight (Assault and Battery). Dkt. 22. In her Memorandum in Opposition to Summary Judgment, Torres voluntarily dismissed Count Four (Tort of Child Abuse). Dkt. 53, at 30.

### III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, the Court must "view[] the facts in the non-moving party's favor." *Id.* To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (citation omitted). Accordingly, the Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that preclude summary judgment. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

# IV. ANALYSIS

All of Torres' claims stem from her allegation that Owen improperly used his role as a school counselor to groom and sexually abuse her. Some of her claims seek to hold the District liable for Owen's conduct based on respondeat superior liability—namely Count III (Negligence per se) and Count VIII (Assault and Battery). Other counts seek to hold the District liable for its own independent acts of negligence. The Defendants have moved for summary judgment on all claims.

## A. <u>Threshold Issues</u>

Before the Court addresses Torres' individual claims, there are a number of threshold issues it must discuss. The Court first addresses the District's Motion to Strike (Dkt. 57) given its potential impact on the Motions for Summary Judgment. Second, the Court considers whether Owen qualifies as a psychotherapist—and Torres as his patient or client—under Idaho Code section 18-919. Third, the Court determines whether Owen's violation of I.C. section 18-919 constitutes negligence per se. Fourth, the Court considers whether the gravamen of Torres' case is medical malpractice. Fifth and finally, the Court discusses whether some of Torres' claims are barred by the applicable statute of limitations. After addressing these threshold issues, the Court will consider Torres' remaining claims.

### 1. *Motion to Strike (Dkt. 57)*

The District asks the Court to strike the Declaration of Miriam Torres ("Declaration") and two attachments filed by Torres in support of her Opposition to Defendant's Motion for Summary Judgment. The District argues that the Declaration violates the sham affidavit rule, is irrelevant, and contains hearsay.

"In order to trigger the sham affidavit rule, the district court must make a factual determination that the contradiction is a sham, and the 'inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit.'" *Yeager v. Bowlin*, 693 F.3d 1076, 1079 (9th Cir. 2010) (citations omitted). The "sham affidavit rule prevents a party who has been examined at length on deposition from raising an issue of fact simply by submitting an affidavit contradicting his own prior testimony." *Id.* at 1080 (citations and punctuation omitted). However, "[t]he sham affidavit rule should be applied with caution because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment." *Id.* (citation and punctuation omitted). In addition, "the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition and minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." *Id.* at 1081 (citations omitted).

The District argues that the Declaration contradicts Torres' deposition testimony and triggers the sham affidavit rule. Torres contends that she merely elaborated, explained, and clarified her earlier answers and there is no "clear and unambiguous" discrepancy. Dkt. 65, at 6. Having reviewed Torres' deposition and declaration, the Court agrees with Torres. While her Declaration contains clarifying information regarding her first counseling session with Owen and elaborates on her deposition testimony, it does not contradict her deposition testimony in a manner that triggers the sham affidavit rule. For instance, while Torres testified in her deposition that she was not sure if her first meeting with Owen

occurred before or after her sixteenth birthday on October 6, 2011, she clarified in her Declaration that, after reviewing a school calendar for the 2011-2012 school year, she learned the first day of school had been on August 8, 2011. Dkt. 53-14, at ¶¶ 3-4. Because she remembered her first counseling session occurred shortly after school started, Torres clarified in her Declaration that she believes her first counseling session occurred prior to her sixteenth birthday on October 6, 2011. *Id.*

Regardless, the District also argues that the Declaration is irrelevant now that Torres has voluntarily dismissed her Tort in Child Abuse claim. Specifically, the District contends that Torres' assertions that Owen began counseling and grooming her prior to her sixteenth birthday are irrelevant now that the child abuse claim has been dropped and should be stricken. Torres disagrees, and argues that this information is still relevant to her remaining claims. Once again, the Court agrees with Torres. Claims of grooming and the timeline of when the relationship between Torres and Owen began may still be relevant to Torres' other claims and to her estoppel argument. As such, the Court will not strike these statements.

Lastly, the District argues that various parts of the Declaration and the attachments contain hearsay. The Court will not set forth its analysis for each alleged hearsay statement, nor will it strike the Declaration and attachments at this time. Instead, the Court notes that it will only consider information that it deems admissible and relevant and will only give the information contained within these filings the weight it considers appropriate. However, if this matter proceeds to trial, Defendants are free to reassert any hearsay arguments regarding this information.

For the above reasons, the District's Motion to Strike (Dkt. 57) is DENIED.

### 2. The Applicability of Idaho Code section 18-919

In Count III, Torres claims Owen violated an applicable duty of care set forth in Idaho Code section 18-919, which states, "any person acting or holding himself out as . . . a psychotherapist . . . who engages in an act of sexual contact with a patient or client, is guilty of sexual exploitation by a medical care provider." In Idaho, it is well established that a statute may define the applicable standard of care and a violation of that statute can constitute negligence per se. *Boswell v. Steele*, 348 P.3d 497, 506 (Idaho Ct. App. 2015). To use a statute to establish the duty of care, four elements must be met:

> (1) the statute or regulation must clearly define the required standard of conduct; (2) the statute or regulation must have been intended to prevent the type of harm the defendant's act or omission caused; (3) the plaintiff must be a member of the class of persons the statute or regulation was designed to protect; and (4) the violation must have been the proximate cause of the injury.

*Id.* (quoting *O'Guin v. Bingham Cnty.*, 122 P.3d 308, 311 (Idaho 2005)) (citations omitted). Torres argues that Owen's role as a school counselor qualifies him as a psychotherapist, that she was his patient or client, and that Idaho Code section 18-919 therefore applies. Alternatively, Torres asserts that, at the very least, Owen falls within the catch-all phrase "other medical care provider" included in the same statute. Dkt. 53, at 7-8.

The term "psychotherapist" is not defined by Idaho Code section 18-919.[2] However, the Idaho Court of Appeals has held by implication that a Licensed Professional Counselor

---

[2] Idaho Rule of Evidence 503(a)(3)—a rule that deals with psychotherapist-patient privilege—defines the term "psychotherapist" as "(A) a physician while engaged in the diagnosis or treatment of a mental or emotional condition, including alcohol or drug addiction, or, (B) a person licensed or certified as a psychologist under the laws of any state or nation, while similarly engaged." I.R.E. 503(a)(3). While that

("LPC") falls within the meaning of "psychotherapist" as used in the statute. *See State v. McKeeth*, 38 P.3d 1275 (Idaho Ct. App. 2001). Notably, this is the same professional license that Owen held during the period in question.

Nonetheless, the District argues that Owen was not acting as a psychotherapist when he met with Torres because he never diagnosed Torres and never provided her with treatment. The District also argues that Torres viewed her meetings with Owen as a way to skip class, and never said that she had a psychological condition that required counseling or therapy. Dkt. 47, at 15-16. After considering the District's arguments, the statute itself, and relevant caselaw, the Court finds that Owen was acting as a psychotherapist subject to Idaho Code section 18-919.

Owen was an LPC when he met with Torres, held the title of school counselor, and represented to Torres that he was going to counsel her. While Torres may have viewed her meetings with Owen as a way to skip class, this is largely irrelevant in determining whether Owen acted as a psychotherapist and whether Torres was his patient or client. *Pines v. Idaho State Board of Medicine*, 351 P.3d 1203, 1212 (Idaho 2015) (patient's belief that he was not in a physician-client relationship with doctor was not determinative, rather doctor's treatment of patient and use of his skills as a physician to examine patient and make and rule out diagnoses in connection with that examination supported finding of a physician-client relationship at time of sexual contact).

At times, Owen engaged in precisely the type of behavior that a counselor or

---

definition may be helpful, it does not necessarily capture the exact meaning the Idaho legislature had in mind when enacting Idaho Code section 18-919. As such, the Court does not rely on this definition.

psychotherapist would engage in—he elicited information from Torres about her life and relationships, and counseled her as to how she should "deal with the emotions she was feeling and the people in her life." Dkt 53, at 9. Significantly, it appears that Owen occasionally tried to provide Torres with treatment. For example, during his deposition, Owen testified that in his first meeting with Torres, he learned that her relationship with her mother "wasn't very good." Dkt. 47-11, at 5. In response, he "set up the next appointment for her mother to come in, because [he] thought: 'Well, we need to probably address that then.'" *Id.*

Further, even if Owen does not qualify as a "psychotherapist" under the statute, the Court finds that he falls within the catch-all phrase "other medical provider." I.C. § 18-919(a). This phrase is defined in the statute as "a person who gains the trust and confidence of a patient or client for the examination and/or treatment of a medical or psychological condition, and thereby gains the ability to treat, examine and physically touch the patient or client." I.C. § 18-919(b)(2). Here, Owen held himself out as a counselor, invited Torres to meet in his office for counseling, and gained her trust as he asked her questions and discussed her life. At the very least, he qualifies as an "other medical provider," and Idaho Code section 18-919 applies.

Regardless, the District argues that even if Owen was acting as a psychotherapist, Torres was not his "patient or client." The District relies on *Pines*, 351 P.3d at 212, in support of this position. In *Pines*, the Idaho Supreme Court considered the case of a doctor (Pines) who induced four young men into sexual contact by saying he was required to give full-body massages to naked "practice patients" in order to be relicensed as a doctor of

osteopathy. *Id.* at 1205. As a result of Pine's conduct, he was disciplined by the Idaho Board of Medicine. *Id.* A district court affirmed the Board's decision, and Pines appealed.

Upon review, the Idaho Supreme Court considered whether the four victims qualified as "patients" under Idaho Code section 18-919. Ultimately, the court held that two of the young men were "patients" and two were not. The court explained that two of the boys were not patients because Pines "never represented to [them] that he was giving them massages to address any actual malady." *Id.* at 1214. Pines simply told the boys that he needed to "practice" giving the massages.

It did not matter to the court that the boys knew Pines was a doctor because "neither of them appear to have had any actual malady Pines purported to treat with the massages. Therefore, in giving the massages, Pines was not holding himself out as able to treat an actual malady as required by subsection (c) [of Idaho Code section 54-1803]." *Id.*

While the Court agrees that *Pines* is relevant to the instant matter, it finds that it is distinguishable in important ways. First, although *Pines* discusses Idaho Code section 18-919, the case itself revolves around disciplinary actions taken by the Idaho Board of Medicine and involves other statutes not at issue in this case.

Second, the relevant portion of the Idaho Supreme Court's analysis concludes that two of the young men were not patients because the doctor had no other previous doctor-patient relationship with them, and the "practice" massages were not purported to treat any sort of malady they suffered from. *Pines*, 351 P.3d at 1214.

Here, however, Owen initially invited Torres to meet with him for counseling because he was aware that she was self-harming. Dkt. 53-5. While Owen may not have

officially diagnosed Torres, he did discuss her feelings and tell her how to "deal with the emotions she was feeling and the people in her life." Dkt. 53, at 9. Owen held himself out as able to counsel students on serious topics like depression, anxiety, etc., and it was part of the job description for Owen's position. Dkt. 47-10, at 2. He also told Torres that she could "talk to him about things that [she] was upset about." Dkt. 47-4, at 35.

Further, as opposed to the doctor in *Pines*, Owen never claimed to merely be "practicing" his counseling skills during his meetings with Torres. Owen invited Torres to participate in *actual* counseling with him, and at times provided services consistent with his position. As noted above, it appears he also occasionally sought to provide Torres with treatment consistent with his role as a counselor. As such, the Court finds that Torres can properly be considered Owen's "patient or client" under Idaho Code section 18-919.

### 3. Whether Owen's Violation of Idaho Code section 18-919 Constitutes Negligence Per Se (Count III)

"In Idaho, it is well established that statutes and administrative regulations may define the applicable standard of care owed, and that violations of such statutes and regulations may constitute negligence per se." *O'Guin v. Bingham County*, 122 P.3d 308, 311 (Idaho 2005). "Negligence per se . . . is a question of law to be decided by the court." *Ahles v. Tabor*, 34 P.3d 1076, 1078 (Idaho 2001). The Idaho Supreme Court has enumerated several criteria to be met before negligence per se would be found." *Id.* These include:

(1) the statute or regulation must clearly define the required standard of conduct; (2) the statute or regulation must have been intended to prevent the type of harm the defendant's act or omission caused; (3) the plaintiff must be a member of the class of persons the statute or regulation was designed to

protect; and (4) the violation must have been the proximate cause of the injury.

*Id.* (*quoting O'Guin*, 122 P.3d at 311).

Here, the Court finds that all four elements are met. First, Idaho Code section 18-919 clearly defines the required standard of conduct—medical care providers are not to have any sexual contact with their patients. *See Hall v. Rocky Mt. Emergency Physicians, LLC*, 312 P.3d 313, 321 (Idaho 2013) (stating that Idaho Code section 18-919 "clearly and unambiguously draws a line that health care providers may not cross"). Second, the statute is clearly designed to avoid the sexual exploitation of patients by their medical care providers.[3] As a result of Owen's conduct, Torres suffered that exact harm. Third, because Torres was Owen's "patient or client," she falls within the class of persons Idaho Code section 18-919 is designed to protect. Fourth, the harm she suffered was proximately caused by Owen's violation of the statute.

Accordingly, the Court finds that Torres may rely upon Owen's violation of Idaho Code section 18-919 to conclusively establish the first two elements of each negligence

---

[3] The Senate Bill that was eventually approved and codified as Idaho Code section 18-919 included a Statement of Purpose that read: "The purpose of this legislation is to establish a special battery crime in situations where a medical care provider abuses the trust and confidence of the patient and engages in an act of sexual contact with the patient." S.B. 1431, 53 Leg., 2d Sess. (Idaho 1996). The Committee Notes indicate that a representative from the Idaho Attorney General's Office recommended that consent not be available as a defense "because it is an unfair situation where one party has an advantage over the other and the disadvantaged party would be unable to make a rational decision." *Sexual Exploitation by a Medical Care Provider: Hearing on S.B. 1431 Before the S. Judiciary and Rules Comm.*, 53 Leg., 2d Sess. (Idaho 1999) (statement of Scott James, representing the Office of the Attorney General). That suggestion was ultimately incorporated into the statute. Clearly, the Idaho legislature recognized that patients tend to place a great deal of trust in their medical care providers. Regardless of whether a patient seeks help for a physical, mental, or emotional concern, they are placed in a vulnerable position and a clear imbalance of power exists. This can make it more difficult for a patient to make rational decisions. Because of this imbalance of power, any sexual contact is prohibited, and considered sexual exploitation—the very harm this statute seeks to prevent.

cause of action she brings. *See Slade v. Smith's Mgmt. Corp.*, 808 P.2d 401, 408 (1991) ("The effect of establishing negligence per se through violation of a statute is to conclusively establish the first two elements of a cause of action in negligence."). As a result, if her negligence claims against Owen proceed to trial, "the elements of duty and breach [will be] 'taken away from the jury.'" *Ahles*, 34 P.3d at 1078 (quoting Prosser and Keeton on Torts 230 (5th ed. 1984)).

### i.    *Respondeat superior liability for the District*

Torres also asserts a negligence per se claim against the District. Although the Court has now found that Idaho Code section 18-919 defined the applicable standard of care Owen owed to Torres, the Court must also determine whether Owen's violation of the statute supports a negligence per se claim against the District.

"Under the doctrine of respondeat superior, 'an employer is liable in tort for the tortious conduct of an employee committed within the scope of employment.'" *Nava v. Rivas-Del Toro*, 264 P.3d 960, 964 (Idaho 2011) (quoting *Finholt v. Cresto*, 155 P.3d 695, 698 (Idaho 2007)). "An employer need not explicitly condone, implicitly adopt, or even have specific knowledge of an employee's wrongful conduct in order to [be] held liable for that conduct under a respondeat superior theory." *Stevens v. Brigham Young University-Idaho*, No. 4:16-CV-00530-DCN, 2018 WL 1040084, at *4 (D. Idaho Feb. 23, 2018).

However, "[s]cope of employment 'refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying

out the objectives of the employment.'" *Id.* (quoting *Richard J. & Esther E. Wooley Trust v. DeBest Plumbing, Inc.*, 983 P.2d 834, 837-38 (Idaho 1999)).

"The servant's conduct is within the scope of his employment if it is of the kind which he is employed to perform, occurs substantially within the authorized limits of time and space, and is actuated, at least in part, by a purpose to serve the master." *Podolan v. Idaho Legal Aid Servs.*, 854 P.2d 280, 287 (Idaho Ct. App. 1993) (citation omitted); *See also Claris v. Oregon S. L. R.R.*, 51 P.2d 217, 218 (Idaho 1935) (explaining that the "true test" is whether "the offending employee [was] in the performance of the master's duty *in reference to the particular act causing the injury*") (emphasis added).

"An employee's purpose or intent, however misguided in its means, must be to further the employer's business interests. . . . If the employee acts from purely personal motives . . . in no way connected with the employer's interest . . . then the master is not liable." *Id.* (citations and punctuation omitted).

"Generally, the issue of whether an employee acted within the scope of employment is a factual question to be decided by the trier of fact." *Id.* (citations omitted). "However, conduct that is clearly outside the scope of employment may properly be decided by the court as a matter of law." *Id.*

Here, the Court finds as a matter of law that Owen's tortious conduct was outside the scope of his employment. Although much of the grooming and sexual contact occurred on the District's property, and within Owen's working hours, no reasonable jury could find that Owen's tortious conduct itself (the grooming and sexual exploitation) was connected with his employer's interest in any way. Instead, it is clear that Owen was acting on purely

personal motives. As the Court will discuss more fully below, although Owen at times provided appropriate and legitimate counseling services to Torres, his grooming and sexual exploitation of Torres had nothing to do with his employment. Accordingly, the District's Motion for Summary Judgment is GRANTED as it relates to Torres' negligence per se claim (Count III).

### 4. Whether the Gravamen of Torres' Case is Medical Malpractice

The District argues that since Torres relies on Idaho Code section 18-919 to establish a duty of care, if the Court finds such reliance proper (which it now has), then the gravamen of the case is medical malpractice and all of Torres' state claims are subsumed into a medical malpractice claim under Idaho Code section 6-1012. Dkt. 56, at 2. That statute states, in part:

> In any case, claim or action for damages due to injury to or death of any person, brought against any physician and surgeon or other provider of health care . . . on account of the provision of or failure to provide health care or on account of any matter incidental or related thereto, such claimant or plaintiff must, as an essential part of his or her case in chief, affirmatively prove by direct expert testimony and by a preponderance of all the competent evidence, that such defendant then and there negligently failed to meet the applicable standard of health care practice of the community . . . .

I.C. § 6-1012.

The Idaho Supreme Court has determined that "the language of the statute clearly treats the provision of health care as a single act and not a series of steps, each of which must be analyzed to determine if it involved professional judgment." *Hoover v. Hunter*, 249 P.3d 851, 856 (2011) (quoting *Hough v. Fry*, 953 P.2d 980, 983 (1998)).

As the Court recently explained:

Because of the unique evidentiary standards set forth in Section 6-1012 for medical malpractice claims—namely that expert testimony is required—if a medical malpractice claim is present in a suit, it precludes most other claims. . . . Said differently, the standards of Section 6-1012 apply to the underlying conduct even if the claims alleged are not for medical malpractice. As a threshold matter in each case, the Court must determine "whether the alleged wrongful act or omission occurred in the course of performing professional services" and is therefore a question of malpractice. *Lapham v. Stewart*, 51 P.3d 396, 403 (Idaho 2002). If so, Section 6-1012 exclusively applies.

*Rowlette v. Mortimer*, 352 F.Supp.3d 1012, 1025 (D. Idaho Oct. 25, 2018).

Simply put, Defendants contend that because Torres relies on Idaho Code section 18-919—a statute that prohibits medical providers from having sexual contact with patients—to establish a duty of care that Owen violated, the alleged wrongful act "occurred in the course of performing professional services" and is therefore a question of malpractice. *Lapham*, 51 P.3d at 403. However, the Court does not agree that reliance upon Idaho Code section 18-919 to establish the duty of care automatically causes any ensuing tort claim to be subsumed into a medical malpractice claim under Idaho Code section 6-1012.

The Idaho Supreme Court has found it "indisputable" that Idaho Code section 6-1012 is not implicated in all tort actions where the defendant is a health care provider. "Rather, by its plain and unambiguous language, the statute applies when the damages complained of result from providing or failing to provide health care." *Hough*, 953 P.2d at 983.

Although a psychotherapist-patient relationship existed between Owen and Torres, the damages Torres complains of did not arise out of the "provision or failure to provide healthcare" as described in Idaho Code section 6-1012. While Owen may have occasionally

provided appropriate counseling services (for example, Torres explains that in some of her meetings with Owen, they discussed her feelings, family, friends and relationships—conversations that the average person would expect a counselor to engage in with clients), at other times, Owen's actions departed from the appropriate behavior of a psychotherapist and entered the realm of grooming and sexual exploitation (for example, when Owen asked about Torres' past sexual experiences in an inappropriate manner, failed to inform her that her sexual contact with an adult male at the age of fourteen was abuse, bragged about his own sexual exploits and prowess, discussed his past sexual relationships with former clients, told Torres that he loved her, asked her to not share details of their meetings with others, indicated that he would kill himself if their relationship ended, and attempted to sow discord between Torres and her mother). These actions have nothing to do with the provision of healthcare and are clear examples of grooming and manipulation.

Thus, although the opportunity for a sexual relationship with Torres arose from the health care relationship that existed between Owen as a psychotherapist and Torres as his patient or client, the damages complained of did not "result from providing or failing to provide health care." *Hough,* 953 P.2d at 983. Instead, the damages resulted from Owen's predatory behavior. Such behavior is not "incidental" to the provision of health care, nor is it a result of the provision of healthcare. Thus, the present case is distinguishable from the Court's recent ruling in *Rowlette.*

Furthermore, the opposite argument—that the damages arose from the provision of healthcare simply because Owen and Torres' relationship began as a counselor-patient relationship and because the alleged grooming and manipulation occurred under the guise

of counseling services—requires an overly expansive view of Idaho Code section 6-1012 and leads to unreasonable outcomes. For example, suppose a doctor is meeting with a patient and providing legitimate medical services. What if, as the patient is sitting on the examination table, the doctor physically attacks the patient and causes injury without any provocation or cause? Should the ensuing tort claim be subsumed into a medical malpractice action simply because the relationship arose out of the provision of healthcare services? Clearly the attack has nothing to do with the doctor's job responsibilities and is unrelated to his services as a physician. Thus, attempting to convert this standard tort claim into a medical malpractice claim is inappropriate.

Similarly, simply because Owen and Torres' relationship began as a counselor-patient relationship, or because Owen occasionally provided appropriate counseling services to Torres, does not mean that any harm he caused her is automatically subsumed into a medical malpractice action. Instead, the Court finds that when Owen provided appropriate counseling services, he acted as a counselor. However, when Owen allegedly groomed and manipulated Torres, he acted as a sexual predator. Such predation has nothing to do with counseling, psychotherapy, or any other medical service.

Admittedly, this finding may seem at odds with the Idaho Supreme Court's statement that "the language of [Idaho Code section 6-1012] clearly treats the provision of health care as a single act and not a series of steps, each of which must be analyzed to determine if it involved professional judgment." *Hoover*, 249 P.3d at 856. However, the Court today is not analyzing each step taken by Owen to determine if professional judgment was exercised. Instead, the Court is saying that Owen's alleged predatory

conduct had nothing to do with the provision of healthcare, and therefore, the ensuing tort claims are not subsumed into a medical malpractice action.

In essence, the Court finds that Owen's conduct falls within two distinct categories. In one, he provided counseling services. In another, he groomed, manipulated, and sexually exploited Torres. If this type of conduct had any legitimate connection to the provision of healthcare, then the Court would be inclined to agree with Defendants that Torres' claims should be subsumed into a medical malpractice action. But grooming and sexual predation have nothing to do with Owen's professional services. Instead, these actions were carried out for Owen's own sexual gratification.

This conclusion is supported by *Hirst v. St. Paul Fire & Marine Ins. Co.*, 683 P.2d 440 (Idaho Ct. App. 1984). Hirst was a high school student who suffered a sports injury and sought medical treatment from a doctor (Donehue). After an initial consultation concerning the injury, Donehue asked Hirst to return a few days later. When Hirst returned, Donehue drugged him. . . and performed sexual acts." *Id.* at 442.

Based upon this and other similar incidents, "Hirst and his parents presented a claim of medical malpractice to the Idaho State Board of Medicine." *Id.* A hearing panel "determined that substantial questions were raised concerning whether the panel had jurisdiction over 'this type of medical malpractice'—which it described as 'unethical medical conduct.'" *Id.* "The panel noted that Donehue's actions were for his own personal satisfaction and that *there is no general rule as to whether such conduct amounts to malpractice*." *Id.* (emphasis added). "The panel unanimously stated that prescribing excess dosages of improper [medication] . . . had no relation to treatment for Hirst's wrestling

injuries." *Id.* (punctuation omitted). Nonetheless, the panel found that "*if* malpractice includes the immoral conduct and criminal acts complained of then . . . the claim may have merit." *Id.* (emphasis added).

Hirst then filed suit against Donehue "alleging he had committed various acts of negligence and professional malpractice." *Id.* Donehue asked his malpractice insurance company to defend the suit, but the insurer refused. Hirst and Donehue eventually settled out of court.

Hirst then sued Donehue's insurer "to collect on the insurance policy which was in force during Donehue's treatment . . . . The policy covered damages resulting from the 'providing or withholding of professional services.'" *Id.* However, an Idaho district court "held that Donehue's actions did not constitute the 'providing or withholding of professional services.'" *Id.* at 443. As a result, the district court "determined that the actions and injuries alleged in the complaint against Donehue were not covered by the terms of the [insurance] policy, as a matter of law," and granted summary judgment in favor of the insurer." *Id.*

Hirst appealed this decision, but the Idaho Court of Appeals affirmed. It explained:

> [E]ven if we assume that "professional services" embrace all enumerated activities within the "practice of medicine," including "treatment of any human disease or injury," there still must be a causal relationship between such treatment and the harm alleged by the malpractice claimant. Here, as the district court noted, there was no specific showing in the record that [Hirst] was damaged in any way simply from the administration of the drugs. Nor was there any showing that Donehue negligently treated the boy's injuries or illness. The district court found that, in spite of the Hirsts' general allegations*, the action in reality was one in tort for sexual molestation* and that the use of the drugs merely rendered Mark more susceptible to Donehue's "advances." We agree.

*Id.* (emphasis added) (punctuation omitted).

Importantly, the Court of Appeals explained that the "scope of 'professional services' does not include all forms of a doctor's conduct simply because he is a doctor." *Id.* at 444. Instead, the court found it proper to "look[] to the act rather than the character of the actor." *Id.* After looking at Donehue's acts, the court was "unpersuaded that the intentional sexual assault constituted 'professional services' under the provisions of the insurance contract." *Id.*

To be sure, there are multiple ways in which *Hirst* is distinguishable from the instant matter. Nonetheless, the Court still finds it relevant and instructive—particularly the court's finding that "scope of 'professional services' does not include all forms of a doctor's conduct simply because he is a doctor." *Id.* Although Donehue at times provided Hirst with legitimate medical services, the Court deemed the sexual molestation outside the scope of those services and viewed the plaintiff's allegations as a tort for sexual molestation.

Similarly, Owen at times provided Torres with legitimate counseling services. Nonetheless, the Court today holds that his grooming and sexual predation had nothing to do with the provision of healthcare and fell well outside the scope of his professional services. Thus, the ensuing tort claims are not subsumed into a medical malpractice action. However, because of the relationship that existed between Owen and Torres (namely that of a medical provider and his patient), Torres can still rely Idaho Code section 18-919 to establish a duty of care owed to her.

5. *Statute of Limitations*

Next, Defendants argue that Torres' claims are barred because she failed to comply with statute of limitations requirements set forth in the Idaho Torts Claim Act ("ITCA") and Idaho Code 5-219(4). Dkt. 47, at 13.

Torres argues that equitable estoppel applies, and therefore, the Defendants cannot raise the statute of limitations as a defense. Dkt. 53, at 18. "A defendant will be estopped from raising the statute of limitations as a bar to plaintiff's action where defendant's representations or conduct dissuaded the plaintiff from prosecuting his or her cause of action during the statutory period." *Holmes v. Iwasa*, 657 P.2d 476, 480 (Idaho 1983). "Estoppel does not 'extend' the statute of limitation. Rather it prevents a party from pleading and utilizing the statute of limitation as a bar, although the time limit of the statute may have already run." *J.R. Simplot Co. v. Chemetics Int'l, Inc.*, 887 P.2d 1039, 1042 (Idaho 1994) (internal citation omitted). If estoppel is applied, the bar on using the statute of limitations as a defense "lasts only for a reasonable time after the party asserting estoppel discovers or reasonably could have discovered the truth." *Ferro v. Society of Saint Pius X*, 149 P.3d 813, 815-16 (Idaho 2006).

The elements of equitable estoppel are: "(a) a false representation or concealment of a material fact with actual or constructive knowledge of the truth, (2) the party asserting estoppel did not know or could not discover the truth, (3) the false representation or concealment was made with the intent that it be relied upon, and (4) the person to whom the representation was made or from whom the facts were concealed, relied and acted upon

the representation or concealment to his prejudice.*" Theriault v. A.H. Robins Co.*, 698 P.2d 365, 369 (Idaho 1985) (internal citations omitted).

"The determination of factors relevant to questions of estoppel is generally a question of fact." *Zumwalt v. Stephan*, 1987 Ida. App. LEXIS 401, *8 (Idaho Ct. App. June 1, 1987). "However, if only one conclusion can be reasonably drawn from the evidence, a determination which is customarily a factual matter can be made as a matter of law. *Id.*

Relatedly, the Idaho Supreme Court has held that "the issue of whether a claim is barred by the statute of limitations may be a question of fact or a question of law, depending on whether any questions of material fact exist . . . If there is conflicting evidence as to when a fact was known or reasonably should have been known, it is a question of fact." *Kawai Farms, Inc. v. Longstreet*, 826 P.2d 1322, 1326 (Idaho 1992). "[O]rdinarily, a question of when the falsity of a representation or concealment should have been discovered is a question of fact for the jury." *Mason v. Tucker and Associates*, 871 P.2d 846, 851 (Idaho Ct. App. 1994). Also, "[i]f the court finds that there exists more than one conclusion that such party [asserting estoppel] exercised due diligence, then a material question of fact exists precluding a granting of summary judgment." *Hall v. Forsloff*, 864 P.2d 609, 612 (Idaho 1993).[4]

According to Torres, Owen "engaged in numerous actions to ensure that, not only did Torres succumb to Owen's grooming so that Owen was able to sexually exploit her, but also that Torres kept Owen's actions quiet." Dkt. 53, at 18-19. As a result of this

---

[4] Although these cases deal with fraud, the Court finds this estoppel analysis applicable to the case at hand.

grooming and manipulation, Torres claims she had no idea that she had been groomed and sexually exploited until approximately eighteen months after her last sexual contact with Owen. Dkt. 53, at 20.

Owen disputes that he made misrepresentations to Torres. He also contends that even if he had made misrepresentations, Torres cannot satisfy the second element of equitable estoppel—the party asserting estoppel did not know or could not discover the truth. According to Owen, had Torres exercised reasonable diligence, she could have discovered that Owen's actions were improper. Owen also argues that Torres did know that the relationship was improper before November 2015 because she conducted an internet search about "counselor patient relationships" and "transference" when she was in high school, thus eliminating the estoppel argument. Dkt. 60, at 6 n.3.

Alternatively, Owen argues that even if Torres can satisfy the second element of equitable estoppel, the statute of limitations still bars her claims because she had plenty of time to pursue legal remedies after she indisputably discovered his actions were abuse. Torres disagrees, and contends that she was sufficiently diligent in light of the circumstances and facts of the case.

The Court has recently wrestled with this extremely difficult topic—namely when, and under what circumstances a statute of limitations can be tolled (via equitable estoppel or some other principle). *See Rowlette,* 352 F. Supp. 3d at 1029-33. Courts, including this Court, have frequently determined that because the standard is one of "reasonableness," if disputes exist, they are best left for resolution by a jury. *See, e.g., id.* at 1031.

In the present case, the situation is no different.[5] Material disputes exist as to when Torres knew, or with reasonable care and diligence should have known, that she had a cause of action against Owen and the District.

It is important to note that the ITCA has a notice requirement specifically for minors, which provides:

> No person who is a minor shall be required to present and file a claim against a governmental entity or its employee under this chapter until one hundred eighty (180) days after said person reaches the age of majority or six (6) years from the date the claim arose or should reasonably have been discovered, whichever is earlier.

Idaho Code § 6-906A. The Idaho Supreme Court has held that the proper inquiry for when the 180-day ITCA notice period begins to run is when a person had knowledge of facts which would cause a reasonably prudent person to know they had a claim. *BHA Investments, Inc. v. City of Boise*, 108 P.3d 315, 321 (Idaho 2005). "The statute does not begin running when a person fully understands the mechanism of the injury and the government's role, but rather when he or she is aware of such facts that would cause a reasonably prudent person to inquire further into the circumstances surrounding the incident." *Id.* (quoting Mitchell v. Bingham Mem'l Hosp., 942 P.2d 544, 547 (Idaho

---

[5] In fact, this case presents additional concerns. For example, Idaho Code section 5-219 outlines that in cases of "professional malpractice," an action must be brought within "two (2) years." Idaho Code 5-219(4). However, as the Court has just explained, Owen's actions do not fall under medical malpractice. Thus, it is not clear Idaho Code section 5-219(4) even applies in this case. Second, Idaho Code section 6-906 outlines the applicable statute of limitations for ITCA claims against government entities and employees acting "within the course or scope of [] employment." While this statute may apply to the District, it does not apply to Owen as the Court has already found that his actions were well outside the course and scope of his employment. Torres' remaining independent tort claims are, therefore, likely subject to their own varying statutes of limitations.

1997)).

The parties in this case dispute which statute of limitations should apply and if the statute has been tolled by any parties' actions or inactions.

In response to a certified question from Judge Winmill of the United States District Court for the District of Idaho to the Idaho Supreme Court in a similarly difficult situation, the Idaho Supreme Court found that "under Idaho law, in determining which statute of limitations applies to a cause of action, courts must focus on substance, rather than the form of a plaintiff's allegations." *Doe v. Boy Scouts of America*, 356 P.3d 1049, 1051(Idaho 2015). *See also id*. n. 3 ("As this court said in *Barnett v. Aetna Life Ins. Co*., 99 Idaho 246,580 P.2d 849 (1978): 'The substance, not the form, of the action controls and determines the applicable Statute of Limitations.'").

This observation notwithstanding, regardless of which statute of limitations applies,[6] the question remains: can it be tolled at all? In a case bearing factual similarities to the present action, Judge Edward J. Lodge concluded that "the question of just when a victim of child abuse knows or should have known she is a victim of abuse and be required by law to pursue remedies in a court of law is not easily answered." Case No. 4:14-cv-00550-DCN-CWD Dkt. 42, at 18 (quoting Report and Recommendation, Dkt. 36, at 27)[7]. In that case, an adult male groomed a minor female and the two ultimately engaged in

---

[6] This issue will clearly need to be dealt with and solidified prior to trial, however, the Court would like more briefing on the issue. A motion in limine will be an appropriate place to determine how to instruct the jury. While the issue of *how* to instruct the jury may remain open, the question of whether they will be instructed is not. As noted, this is a question of fact that cannot be resolved at this stage.

[7] For reasons unknown to the Court, this decision was not published on Westlaw and is, essentially "un-citable." Accordingly, the Court references this language only by way of illustration.

sexual relations. At the time, the minor victim believed she was in a legitimate relationship; however, it was not until she was older that she realized the interactions were inappropriate and amounted to child abuse. The Court in that case found that there were questions of fact regarding when she should have reasonably known of her injury which precluded summary judgment.

Similarly, in this case Torres believed she was in a legitimate relationship with Owen until she reached the age of majority and understood the inappropriateness, and implications, of Owen's prior actions. Without knowledge of the injury, a reasonable juror could conclude Torres did not have sufficient facts to place a reasonably prudent person on inquiry notice of her claims against Owen or the District until many years after the actual incidents occurred.

Upon thorough review—and considering the estoppel factors set forth above—the Court finds that more than one conclusion regarding estoppel and whether Torres was sufficiently diligent can be reasonably drawn from the evidence in the record. As such, whether Torres' claims are barred by applicable statutes of limitations is a question of fact the Court will reserve for the jury.

## B. <u>Torres' Individual Claims</u>

### 1. *Title IX Claim (Count I)*

Title IX states that, "no person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

The Supreme Court has held that "it would 'frustrate the purposes' of Title IX to permit a damages recovery against a school district for a teacher's sexual harassment of a student based on principles of respondeat superior or constructive notice, i.e., without actual notice to a school district official." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285 (1998). Thus, "[t]o be liable for harassment under Title IX, the recipient of federal funds . . . must have actual notice of, and be deliberately indifferent to, the harassment." *Samuelson v. Or. State Univ.*, 725 Fed. Appx. 598, 598 (9th Cir. 2018) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998)). "Because liability may only arise from a recipient's own misconduct, the recipient's deliberate indifference must have subjected the student to, or made them more vulnerable to, the harassment." *Samuelson*, 725 Fed. Appx. At 598-99.

However, actual notice is not always required. The Ninth Circuit has explained, "*Gebser* does not make pre-litigation notice of an alleged violation a prerequisite to recovery in every Title IX case, or even in every sexual harassment case" and that "[p]roof of actual notice is required only when the alleged Title IX violation consists of an institution's deliberate indifference to acts that 'do not involve official policy of the recipient entity.'" *Mansourian v. Regents of the Univ. of Cal.*, 602 F.3d 957, 967 (9th Cir. 2010). Here, Torres contends that the District had actual notice of Owen's sexual harassment. Alternatively, she argues that even if the District did not have actual notice, it had an official policy of deliberate indifference, thereby removing the actual notice requirement.

### i. *Actual Notice*

The District contends that "there is no proof that [it] had any direct or actual knowledge of the consensual sexual relationship between Owen and Plaintiff until 17 months after Plaintiff left the District." Dkt. 47-1, at 27. That may be true. But Title IX does not require direct or actual knowledge *of the sexual relationship*. Instead, courts within the Ninth Circuit have found that the actual notice requirement is met "when an appropriate school official has actual knowledge *of a substantial risk* of abuse to students based on prior complaints." *Doe A. v. Green*, 298 F. Supp. 2d 1025, 1032 (D. Nev. 2004) (emphasis added); *see also J.J. v. Olympia Sch. Dist.*, No. C16-5060 BHS, 2017 WL 347397, at *6 (W.D. Wash. Jan. 24, 2017) ("[L]egal authority shows that a triable issue of fact arises when a school official is confronted with known acts that could objectively be characterized as sexually motivated . . .").

"Certain courts have found the [actual notice] standard is met 'when an appropriate school official has actual knowledge of a substantial risk of abuse to students based on prior complaints.'" *S.T. v. Yakima Sch. Dist.*, No. 11-CV-3085-TOR, 2013 WL 807197, at *7 (E.D. Wash. Mar. 5, 2013) (citing *Doe A. v. Green*, 298 F. Supp. 2d 1025, 1032 (D. Nev. 2004); *Gordon v. Ottumwa Cnty. Sch. Dist.*, 115 F. Supp. 2d 1077, 1082 (S.D. Iowa 2000) (actual notice "does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff-student")).

"In other words, the 'test is whether the appropriate official possessed enough knowledge of the harassment that he or she reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based."

*Yakima*, 2013 WL 807197, at *7 (quoting *Roe v. Gustine Unified Sch. Dist.*, 678 F. Supp. 2d 1008, 1030 (E.D. Cal. 2009)); *see also Aguilar v. Corral*, No. CIVS 07-1601 LKK/KJM, 2007 WL 2947557, at *7 (E.D. Cal. Oct. 9, 2007) (adopting "the majority rule that knowledge of a substantial risk of harassment is sufficient to place a school on actual notice").

Whether an official had actual notice is generally a question of fact. *See Doe ex rel. Doe v. Dallas Independent School Dist.*, 220 F.3d 380, 384 (5th Cir. 2000) (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). However, the Court may make this determination as a matter of law if there is no genuine issue of material fact as to actual notice. *Dallas*, 220 F.3d at 385.

Here, Torres points to two facts in support of a finding of actual notice. First, she claims the District had actual notice because it was aware that "Owen had previously failed to report to authorities sex abuse of a 13 year-old by a 17 year-old, and instead of reporting, had the parties keep the abuse quiet and had the 17 year-old do nothing more than write a letter of apology." Dkt. 53, at 16. However, the Court finds this incident did not alert the District to a substantial risk that Owen would abuse Torres or any other student. While it may show some propensity to disregard reporting requirements, or even a lack of concern for sexual abuse, it does not show that Owen himself posed a substantial risk of abuse.

Regardless, Torres argues that the District had actual notice because McCandless specifically told the District that Owen had been sending Torres flirty text messages. This conduct was in clear violation of District policy, and, according to Torres, the District did

nothing in response to this information. Later, McCandless complained a second time that Owen continued to contact her daughter and still nothing changed.

At oral argument, the District urged the Court to review the transcript of McCandless's deposition. The District claimed her deposition testimony was clear, and that it revealed that she never told the District that Owen was flirting with her daughter. The District further claimed that she never told the District that she was concerned about what Owen said in his text messages—she simply said she did not like Owen texting her daughter.

Having reviewed the portions of the deposition contained in the record, the Court cannot agree with the District. McCandless's exact testimony was that she did not remember exactly what the text messages said. However, she did state that the "flirtiness of the texts," caused her to suspect Owen had a "crush" on her daughter. Dkt. 53-7, at 5.

McCandless further testified that she told Torres that Owen "was being inappropriate" and "should not be texting her." *Id.* at 3. Significantly, she also "had the exact same conversation" with employees of the District, including Superintendent Dunn and Principal Jenks, and she testified that when she made her report to the District, she was "upset," "angry," and "pretty disgusted." *Id.* She felt that she "made it plain to the school . . . that [she] didn't want [Owen] to have anything to do with [her] kids." *Id.* at 4.

These statements are obviously alarming. However, McCandless also used some language that suggests at least some (or perhaps all) of the reported messages were fairly innocuous. Specifically, she said the messages were "flirty and kind of like: 'How are you

doing today?' Like, chatty. Like friendly chatter-type stuff. It wasn't about: 'Hey, I need to change my schedule.' . . . It was not academic related." Dkt. 53-7, at 3.

This puts the Court in a difficult position because it does not know precisely what the reported messages said, or exactly what McCandless told the District. If the Court were to assume that the reported text messages *only* contained "friendly chatter type stuff," a good argument could be made that the District did not have actual notice here. But again, other statements from McCandless—namely that the texts were flirty, that Owen "was being inappropriate," that the texts raised suspicion that Owen had a crush on Torres, and that she was "pretty disgusted" when she reported the texts to the District—suggest there may have been more than "friendly chatter." The Court cannot say for sure.

Ultimately, because Torres is the non-moving party, the Court must construe the evidence in the light most favorable to her and draw all justifiable inferences in her favor. When doing so, the uncertainty over what McCandless reported to the District weighs against summary judgment. It is not the Court's role at this stage to weigh the evidence and determine the truth of the matter. Instead, the Court must determine whether there is a genuine issue for trial. Here, a genuine issue for trial exists. Torres claims Owen sent her flirty text messages, and those messages were reported to the District. The District had a policy prohibiting employees from texting students, which Owen plainly violated. The messages that were reported to the District *may* have been sexually motivated on their face and clearly alerted the District to a substantial risk of abuse—the Court cannot rule that possibility out, and such a conclusion finds at least some support in the record. Thus, the Court will allow Torres' Title IX claim to proceed.

Admittedly, this entire discussion about a report from Torres' mother may seem at odds with the Supreme Court's holding in *Gebser*. There, the Court held that "a complaint from parents of other students charging only that [the teacher] had made inappropriate comments during class, was plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student." *Gebser*, 524 U.S. at 291.

However, *Gebser* is distinguishable in two primary ways. First, the context in which the reported comments were made was different. The parents in *Gebser* simply reported that the teacher was making inappropriate comments in class. Here, McCandless reported private, flirty text messages sent by Owen to her daughter on her personal cell phone.

Second, the plaintiff in *Gebser* testified that the teacher "treated students as if they were adults, but never made blatantly sexual or otherwise offensive remarks." Brief for Respondent at 2, *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) (No. 96-1866). He "flattered [the plaintiff] with suggestions that she was more mature than other students; [and] began to make subtle remarks-often tied to a literary reference-which were implicitly sexual." *Id.* at 3. However, these subtle remarks were vague. For example, during one class, the teacher "made a reference to 'Tantra' believing that [the plaintiff] alone would understand that 'Tantra' was 'sex magic.'" *Id.*

In light of these facts, it is little wonder the Supreme Court found that general complaints (from other students' parents) about inappropriate comments were "plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student." *Gebser*, 524 U.S. at 291. Without something more, the

parents' report was not enough to constitute actual knowledge of a substantial risk of abuse to students.

Here, the situation *may* be much different. Unlike in *Gebser*, uncertainty remains over what was actually reported to the school. If this case proceeds to trial, Torres will carry the heavy burden of showing that the report the District received provided it with actual notice of a substantial risk of abuse to her. However, based upon the current record, the Court is unable to make this determination as a matter of law.

In sum, a reasonable jury may be able to find that, following the report it received from McCandless, the District had actual knowledge of a substantial risk of abuse to Torres.[8] Additionally, a reasonable jury could find that the District's alleged failure to do anything in response to this report was clearly unreasonable and constituted deliberate indifference. As such, the District's Motion for Summary Judgment is DENIED as it relates to Torres' Title IX claim.[9]

### 2. Sex Discrimination in Violation of § 1983/Denial of Equal Protection (Count II)

To prevail on her § 1983 civil rights claim, Torres must show (1) she suffered a

---

[8] In a case involving reports of a high school basketball coach texting female students, the Eighth Circuit said "the most suggestive text message, which was sent from [the coach's] phone to a female student stating, 'OMG you look good today,' did not go so far as to suggest actual sexual conduct or sexual abuse." *Doe v. Flaherty*, 623 F.3d 577, 585 (8th Cir. 2010). Such a holding seems to suggest that a "flirty" text message from a school employee to a student must be overtly sexual in order to satisfy the "actual notice" requirement. However, in *Flaherty*, the court explained that after this message was reported, the superintendent confronted the coach, and the coach claimed that a male student "had taken his phone and sent the message." When the superintendent followed up on this claim, the male student "admitted . . . that he indeed had taken [the coach's] phone from his desk and sent the message." *Id.* at 581. As such, *Flaherty*'s persuasive value is substantially limited because the most suggestive text message was not actually sent by the school employee.

[9] Because the Court finds that a reasonable jury could conclude that the District had actual notice, the Court need not address Torres' "official policy of deliberate indifference" argument.

violation of rights protected by the Constitution or created by federal statute, and (2) the violation was proximately caused by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

At the outset, the Court must note two points of confusion related to Count II. First, although Torres' brief states Owen also violated her right to equal protection, her Amended Complaint only brings this claim against the District. Thus, the Court will not consider whether Owen may be liable under § 1983. *Diamond S.J. Enter., Inc. v. City of San Jose*, No. 18-CV-01353-LHK, 2018 WL 5619746, at *6 (N.D. Cal. Oct. 29, 2018) ("Plaintiff cannot amend the complaint through briefing.").

Second, in her Amended Complaint, Torres includes the following heading for her § 1983 claim:

COUNT II
VIOLATION OF 42 U.S.C. § 1983
Equal Protection

Dkt. 22, at 10 (bolding removed).

Torres then alleges that the District "acting under color of state law, violated Plaintiff's federally protected civil rights under 42 U.S.C. § 1983, including Plaintiff's right to be free from discrimination on the basis of sex." *Id.* From this, it seems clear that Torres' is bringing an equal protection claim.

However, the District's Motion for Summary Judgment did not address the merits of Torres' equal protection claim, and instead construed Count II as a due process claim based upon a violation of Torres' right to bodily integrity. To further complicate matters, Torres defended the merits of a due process bodily integrity claim in her brief and at oral

argument. Torres concludes this section of her brief with the assertion that "Owen's sexual abuse of her violated Torres' liberty interest in her bodily integrity." Dkt. 53, at 29.

However, the very next sentence of her brief states: "Regardless [of the merits of a bodily integrity claim], Torres brought her claim under the Fourteenth Amendment as an equal protection claim, alleging that the District and Owen interfered with her right to an education based upon her sex. Dkt. 53, at 29. Based upon this confusion and inconsistency, it is unclear whether the Court should address the parties' arguments regarding bodily integrity at all.

Nonetheless, Rule 8 simply requires "sufficient allegations to put defendants fairly on notice of the claims against them." *McKeever v. Block*, 932 F.2d 795, 798 (9th Cir. 1991). Apparently, Torres' allegations put the District on sufficient notice of a bodily integrity claim. Since the parties have briefed and argued the merits of such a claim, the Court will address it here.

i.    *Section 1983 bodily integrity claim*

The District argues that Torres' § 1983 claim must fail because no constitutional right is violated when a student who has reached the age of majority enters into a consensual sexual relationship with a school employee.

Although the Ninth Circuit has said that a student's liberty interest in bodily integrity "includes the right to be free from sexual abuse by school employees," *see Plumeau v. School Dist. #40*, 130 F.3d 432, 438 (9th Cir. 1997), the District argues that this right was not violated here. In support of this position, the District relies on *Hei v. Holzer*, in which the Idaho Supreme Court held that no constitutional rights were violated

when " a[n] [adult] high school student [is] involved in a sexual relationship with a teacher." 73 P.3d 94, 99 (Idaho 2002).

Although courts have found that there is a constitutional right for students to be free from sexual abuse by a teacher, the Idaho Supreme Court found that most cases addressing the issue reached that conclusion "in large part because sexual intercourse with a minor is illegal and presumptively without their consent." *Id.* at 99. Thus, the court held that an adult high school student "fail[ed] to point to any constitutionally-protected right violated by the [consensual] sexual relationship with [her teacher] and, therefore, her § 1983 claim must fail." *Id.* at 99-100.

However, because § 1983 claims are federal, *Hei* is not binding on this court. Additionally, other courts outside of this District have reached the opposite conclusion. For example, the Eastern District of Louisiana held that a student may state a viable substantive due process claim following sexual contact with a teacher, even if the student was an adult when the sexual contact occurred. *Henry v. Toups*, No. CIV. 08-939, 2010 WL 3398857, at *7 (E.D. La. Aug. 23, 2010) ("Jane Doe's substantive due process claims are grounded upon the premise that school children—[not just] school children who are under 18 . . . have a liberty interest in their bodily integrity that is protected by the due process laws of the Fourteenth Amendment.").

Similarly, the United States District Court for the District of Columbia "assume[d] without deciding" that a student who was eighteen when she entered into a sexual relationship with a teacher could still "allege a substantive due process violation relating to bodily integrity." *Blue v. Dist. Of Columbia*, 850 F. Supp. 2d 16, 25 (D.D.C. Mar. 8,

2012).

It appears the Ninth Circuit has never squarely addressed this issue. However, even though *Plumeau* involved a minor child who was sexually abused by a school employee, the court did not explicitly distinguish between minor and adult students when it held that a student's liberty interest in bodily integrity "includes the right to be free from sexual abuse by school employees." *Plumeau*, 130 F.3d at 438.

That said, the Ninth Circuit did state that "the Constitution protects a *child's* right to be free from sexual abuse by school employees while attending public school." *Id.* (emphasis added). Perhaps one could point to this statement and argue that the Constitution does not protect a public-school student's right to be free from sexual abuse by a school employee if the student has reached the age of majority. However, such an argument is clearly unreasonable.

The *Plumeau* court explained that each of the factors that must be considered when deciding whether substantive due process has been violated "weighs heavily in favor of the conclusion that public-school children have a constitutionally protected right not to be sexually abused by school employees at school. No governmental need could justify such conduct." *Id. (citing Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 727 (3d Cir. 1989) ("a teacher's sexual molestation of a student could not possibly be deemed an acceptable practice.")).

Could a governmental need ever justify a public-school employee sexually abusing a high school student, even if the student had reached the age of majority? Clearly the

answer is no. The only reasonable conclusion when considering this question is that the constitution protects the bodily integrity of public school students—regardless of their age.

However, this still does not account for the Defendants' argument that Owen's contact with Torres was not sexual abuse at all because she was a consenting adult at the time. While the Court understands the Defendants' position, such an argument conveniently ignores the alleged grooming and manipulation that occurred long before Torres turned eighteen and continued after she turned eighteen. It also fails to account for the clear power imbalance that existed between Owen as a counselor at the school, and Torres as a student.

By way of comparison, the Ninth Circuit has specifically held that a prisoner cannot consent to sexual contact with prison guards due to the innate power disparity created by the custodial relationship. *See Wood v. Beauclair*, 692 F.3d 1041, 1046-47 (9th Cir. 2012) (finding that "the power dynamics between prisoners and guards make it difficult to discern consent from coercion."). Significantly, in reaching this conclusion, the Ninth Circuit said:

> The power disparity between prisoners and prison guards is similar to that of an adult over a child or a teacher over a student. . . . Just as power inequities between adults and minors, teachers and students, and owners and slaves foster opportunities for sexual abuse, so too does the prisoner-guard relationship.

*Wood*, 692 F.3d, at 1047.

Admittedly (and despite what some students may think), public school presents a much different environment than prison. However, the Ninth Circuit specifically likened the relationship between a prisoner and a guard to that of a student and their teacher. In both situations, there is an obvious power imbalance. In both situations, there is a very real

and unfortunate risk that the power imbalance could be exploited by the more powerful party. This is true regardless of the age of the less powerful party. Simply reaching the age of eighteen does not change this dynamic for a student. A similar power imbalance existed between Torres and Owen here, and the Court sees no persuasive reason to differentiate between a teacher having sex with a student, and a school counselor having sex with a student.

In sum, the Court finds that the Constitution protects a student's right to be free from sexual abuse by school employees while attending public school. This is true for both minor students, and students who have reached the age of majority. The Court also finds that, in light of the power imbalance that existed between Torres as a student and Owen as a school counselor, as well as the alleged grooming and manipulation that occurred, a reasonable jury could find that the sexual contact involved in this case was sexual abuse. As such, the District's Motion for Summary Judgment is DENIED as it relates to Torres' § 1983 bodily integrity claim.

*ii.*     *Section 1983 Equal Protection claim*

As noted above, Torres' Amended Complaint clearly brings a claim under the Fourteenth Amendment Equal Protection Clause—alleging that the District and Owen interfered with her right to equal access to education on the basis of her sex. Torres basis this on Owen's repeated removal of Torres from class. In essence, she claims that—as a result of being frequently removed from class—she was deprived of learning opportunities and did not have an equal access to education.

This is problematic for the District because they provided no substantive response

to Torres' equal protection claim in their briefing or during oral argument. While the District did raise the statute of limitations as a defense generally, the Court has already determined that whether Torres' claims are barred by a statute of limitations presents questions of fact that must be reserved for a jury.

As this is the District's Motion for Summary Judgment, it carries the burden to show that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The District has failed to meet that burden as it relates to Torres' Equal Protection claim. Therefore, the District's request for summary judgment on Torres' § 1983 Equal Protection claim is DENIED.

### 3. Negligence (Count V); Negligent Infliction of Emotional Distress (Count VI)

Count V (Negligence) and Count VI (Negligent Infliction of Emotional Distress) are both based upon the common law concept of negligence. *See Johnson v. McPhee*, 210 P.3d 563, 574 (Idaho Ct. App. 2009) ("Negligent infliction of emotional distress is simply a category of the tort of negligence, requiring the elements of a common law negligence action."). A cause of action for common law negligence in Idaho has four elements: "(1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual loss or damage." *Nation v. State, Dep't of Corr.*, 158 P.3d 953, 965 (Idaho 2007).

Similarly, to succeed on her negligent infliction of emotional distress claim, Torres must show (1) that a legally recognized duty existed; (2) a breach of that duty; (3) a causal connection between Owen's conduct and the breach; and (4) actual loss or damage. *Wright*

*v. Ada Cnty.*, 376 P.3d 58, 68 (Idaho 2016). Torres asserts these claims against both Owen and the District.

Owen's only argument regarding these claims is that they are barred by the statute of limitations. The Court has already rejected this argument and found that questions of fact exist regarding the statute of limitations and that these questions will be reserved for a trier of fact. Accordingly, Owen's request for summary judgment is DENIED as it relates to these claims.

The District argues that there is no genuine question of material fact and that as a matter of law, it did not owe a general duty of care to Torres to protect her from injury arising out of a "consensual sexual relationship with Owen." Dkt. 47-1, at 21-22. According to the District, "there is no basis to conclude that the fact that Owen had been accused of not reporting an unrelated claim of sexual abuse . . . and the unsubstantiated claim that [Torres] and Owen were spending three hours a week together at school gave the District sufficient knowledge to conclude that it was foreseeable that Owen and [Torres] would, as consenting adults, strike up a romantic relationship several years later." *Id.*

Torres argues that the relationship was a result of grooming and manipulation and could not have been consensual. As noted above, the Court has now determined that, in light of the power imbalance that existed between Torres as a student and Owen as a school counselor, as well as the alleged grooming and manipulation that occurred, a reasonable jury could find that the sexual contact involved in this case was sexual abuse.

Torres also asserts that Idaho Code section 18-919 once again provides the duty of care Owen violated. She argues that the District should be held liable because the District

had a duty to take reasonable steps to guard against "foreseeable harm" and that a breach

of this duty constitutes negligence. The Idaho Supreme Court discusses this duty in

*Stoddart v. Pocatello School District # 25*, explaining that "[d]etermining whether a duty

will arise in a particular instance involves a consideration of policy and the weighing of

several factors." 239 P.3d 784 (Idaho 2010). These factors include:

> The foreseeability of harm to the plaintiff, the degree of certainty that the
> plaintiff suffered injury, the closeness of the connection between the
> defendant's conduct and the injury suffered, the moral blame attached to the
> defendant's conduct, the policy of preventing future harm, the extent of the
> burden to the defendant an d consequences to the community of imposing a
> duty to exercise care resulting liability for breach, and the availability, cost,
> and prevalence of insurance for the risk involved.

*Id.* (citing *Rife v. Long*, 908 P.2d 143, 148-49 (Idaho 1995) (citations omitted). The District

contends that the potential harm was not foreseeable. In discussing this factor, the *Stoddart*

Court explained:

> Foreseeability is a flexible concept which varies with the circumstances of
> each case. Where the degree of result or harm is great, but preventing it is
> not difficult, a relatively low degree of foreseeability is required. Conversely,
> where the threatened injury is minor but the burden of preventing such injury
> is high, a higher degree of foreseeability may be required. . . . *Normally, the*
> *foreseeability of a risk of harm, and thus whether a duty consequently*
> *attaches, is a question of facts reserved for the jury*. . . . Foreseeability is
> most commonly addressed when considering the question of proximate
> causation.

*Id.* (emphasis added).

Torres cites various facts that she asserts show the District should have reasonably

foreseen the harm that occurred. Torres claims that Owen called her into his office on a

near daily basis, and sometimes removed her from class for hours at a time. *See* Dkt. 22, at

17. Torres also claims that her mother told school administrators multiple times that Owen

was not to have any interaction with her children. Torres claims that despite these requests, Owen continued to text her and hold counseling sessions with her. Torres also argues that the District failed to properly monitor, train, or reprimand Owen following these incidents. *See* Dkt. 53, at 32-33.

Here, the foreseeability of a risk of harm, and thus whether a duty consequently attached, is a question of fact that should be reserved for a jury. Based on the evidence in the record, a reasonable jury could find that the District owed a duty to Torres, that duty was breached, the breach was the proximate cause of Torres' injury because it was foreseeable to the District that some harm could happen, and that Torres suffered damages. Therefore, the District's Motion for Summary Judgment as to Counts V and VI is DENIED.

### 4. Intentional Infliction of Emotional Distress (Count VII)

Under Idaho tort law, four elements are necessary to establish a claim of intentional infliction of emotional distress: (1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe. *Hopper v. Swinnerton*, 317 P.3d 698, 707 (Idaho 2013).

"Liability for this intentional tort is generated only by conduct that is very extreme." *Johnson*, 210 P.3d, at 572. "The conduct must be not merely unjustifiable; it must rise to the level of 'atrocious' and 'beyond all possible bounds of decency,' such that it would cause an average member of the community to believe that it was outrageous." *Id.* (citation omitted).

Owen's only argument regarding this claim is that it is barred by the statute of

limitations. The Court has already rejected this argument and found that questions of fact exists that must be presented to a jury for consideration. Accordingly, Owen's request for summary judgment is DENIED as to this claim.

The District's argument regarding this claim was grouped together with its argument against Torres' Negligence and Negligent Infliction of Emotional Distress claims. In essence, the District argues that it did not owe Torres a duty of care to safeguard her from Owen's tortious conduct. As discussed above, this issue presents a question of fact that should be reserved for a jury. In the absence of any other substantive arguments, the District has failed to meet its burden on this issue, and its Motion for Summary Judgment is DENIED as to this claim.

### 5. Assault and Battery (Count VIII)

#### i.    Claim against Owen

Torres' Amended Complaint claims Owen's sexual abuse constitutes assault and battery. Owen's Motion for Summary Judgment raised no substantive arguments in response to this claim. As the moving party, he carries the burden to show that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Owen has failed to meet that burden here. Therefore, his request for summary judgment on this claim is DENIED as to this claim.

#### ii.    Claim against the District

Torres also seeks to hold the District liable for assault and battery under the doctrine of respondeat superior. The District argues that Idaho Code section 6-904 grants it immunity from liability on this claim. That provision is part of the ITCA which is

structured into three tiers. "The general rule is that governmental entities are liable for damages arising out of their own negligent or otherwise wrongful acts and for those of their employees who were acting within the course and scope of their employment." *Grant v. Twin Falls*, 813 P.2d 880, 887 (Idaho 1991).

However, Section 6-904 of the ITCA sets out certain exceptions to liability, including "an exception for acts such as battery and false imprisonment commonly known as intentional torts." *Id.* at 887-88. Specifically, this provision states:

> A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which . . . [a]rises out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

Idaho Code § 6-904(3)

The District claims this provision protects it from liability. Torres counters that although the District may not be directly liable, it is still liable for Owen's misconduct because he was acting with malice and criminal intent. In support of this contention Torres quotes Idaho Code section 6-903, which states: "Except as otherwise provided in this act, every governmental entity is subject to liability for money damages arising out of its negligent or otherwise wrongful acts or omissions and those of its employees acting within the course and scope of their employment or duties." Idaho Code § 6-903(1).

However, as noted above, this provision establishes liability, while Idaho Code section 6-904 creates certain exceptions to that liability. As the Idaho Supreme Court explained in *Hoffer v. City of* Boise: "The plain language of the first clause of [section 6-904] exempts governmental entities from liability for the torts it lists, *whether or not there*

*has been an allegation of malice or criminal intent.*" 257 P.3d 1226, 1228 (Idaho 2011) (emphasis added); *see also Bates v. 3B Detention Center*, Case No. 4:14-cv-359-BLW, 2016 WL 1755404 at *3-4 (D. Idaho May 2, 2016) ("The result of this interpretation is that Idaho governmental entities ha[ve] complete immunity for the listed torts even if their employees committed the tort with malice or criminal intent.").

Accordingly, the District's Motion for Summary Judgment is GRANTED as it relates to Torres' Assault and Battery claim.

### 6. Negligent Supervision (Count IX)

Torres asserts that the District had a statutory duty "to protect the morals and health of their students." Dkt. 22, at 16. Presumably Torres seeks to apply Idaho Code section 33-512(4) which provides that school districts have a duty "[t]o protect the morals and health of their pupils."

The Idaho Supreme Court has "ruled that when the legislature enacted I.C. § 33-512(4), it created a statutory duty which requires a school district to act reasonably in the face of foreseeable risks of harm." *Brooks v. Logan*, 903 P.2d 73, 79 (Idaho 1995) (citations omitted). "[T]his statutory duty exemplifies the role of the state to the children in school, which is a role described as one in loco parentis.'" *Id.* (citations omitted).

"[T]he duty a school district owes to its pupils is to anticipate reasonably foreseeable dangers and to take precautions protecting the children in its custody from such dangers." *Id.* "Thus . . . a school district has a duty, exemplified in I.C. § 33-512(4), to act affirmatively to prevent foreseeable harm to its students." *Id.*

Torres contends that the District knew Owen "possessed dangerous propensities," became aware of his pattern of pulling Torres from class for extended periods of time, became aware of his improper texting, etc., and therefore should have reasonably anticipated the sexual abuse that occurred. Despite this knowledge, the District did nothing to protect Torres from Owen's predatory behavior.

The District counters that this claim requires proof of "actual knowledge," for a duty to rise, and here, Torres cannot prove that the District had actual knowledge of Owen's misconduct. Torres argues that a different standard applies. She cites to an Idaho Court of Appeals case, which states:

> In the context of negligent supervision, duty is the product of the supervisor's "special relationship" with the supervised individual, not with the injured person. . . . The duty requires the supervisor who knows of the supervisee's dangerous propensities to control the supervisee so he will not injure third persons. [The Idaho] Supreme Court has held that the duty described in the RESTATEMENT (SECOND) OF TORTS § 319 applies to questions of negligent supervision in Idaho. That section states: One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

*Podolan v. Idaho Legal Air Services, Inc.*, 854 P.2d 280, 289 (Idaho Ct. App. 1993) (internal citations omitted). Torres argues that the District was put on notice numerous times that Owen was engaging in behaviors that could harm not only a third party, but Torres directly. Torres contends that the District was on notice that Owen was providing counseling and developing relationships with students, that he was sending Torres flirty text messages, and that his role as counselor placed him in a position of psychological

control and influence over students (including Torres), yet the District did not properly supervise him.

A reasonable jury could find based on the above standard and facts that the District was negligent in its supervision of Owen and that harm to a third party was foreseeable. At the very least, there are disputed facts that preclude summary judgment at this time. Therefore, the District's Motion for Summary Judgment on Torres' claim of negligent supervision is DENIED.

## V. ORDER

THE COURT HEREBY ORDERS:

1.  Owen's Motion for Summary Judgment (Dkt. 46) is DENIED.

2.  The District's Motion for Summary Judgment (Dkt. 47) is GRANTED IN PART and DENIED IN PART consistent with the above analysis, and as set forth below:

    a)  The District's Motion for Summary Judgment on Torres' Title IX claim is DENIED.

    b)  The District's Motion for Summary Judgment on Torres' § 1983 claim is DENIED.

    c)  The District's Motion for Summary Judgment on Torres' Negligence per se claim is GRANTED.

    d)  The District's Motion for Summary Judgment on Torres' Negligence claim is DENIED.

    e)  The District's Motion for Summary Judgment on Torres' Negligent Infliction of Emotional Distress claim is DENIED.

f)  The District's Motion for Summary Judgment on Torres' Intentional Infliction of Emotional Distress claim is DENIED.

g)  The District's Motion for Summary Judgment on Torres' Assault and Battery claim is GRANTED.

h)  The District's Motion for Summary Judgment on Torres' Negligent Supervision claim is DENIED.

3.  The District's Motion to Strike is DENIED.

DATED: September 30, 2019

David C. Nye
Chief U.S. District Court Judge